**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2013-NMCA-007

Filing Date: October 24, 2012

Docket No. 31,085

ERIC GOMEZ,

       Plaintiff-Appellant,

v.

BRENNAN JONES-WILSON,

       Defendant-Appellee,

and

CITY OF ALBUQUERQUE and
ROBERT OSBORN d/b/a
DISTRACTED BY DÉCOR,

       Defendants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**C. Shannon Bacon, District Judge**

Fine Law Firm
Mark Fine
Albuquerque, NM

for Appellant

Dines & Gross, P.C.
Robert A. Corchine
Steven J. Leibel
Albuquerque, NM

for Appellee

**OPINION**

1

**FRY, Judge.**

**{1}**    This case involves an alleged pre-litigation oral settlement agreement between Plaintiff's attorney and the attorney for Penske Truck Leasing (Penske) and Defendant Jones-Wilson.  While both attorneys believed that they had agreed to a settlement during their phone call, they differed on whether Plaintiff's attorney had agreed to settle the claims against both Penske and Jones-Wilson or whether he had agreed only to settle the claims against Penske.  After Plaintiff filed suit and some discovery had been conducted, Jones-Wilson moved for enforcement of the alleged agreement, and the district court granted the motion.  Because the evidence establishes that Plaintiff had not given his attorney the authority to settle with Jones-Wilson, we reverse.

**BACKGROUND**

**{2}**    This case arises from a car accident causing injury to Plaintiff, allegedly due to Jones-Wilson's negligent operation of a truck that his employer, Defendant Robert Osborn d/b/a Distracted by Décor, had rented from Penske.  The truck was insured by a liability policy procured through Penske with per-person limits of $25,000, and Jones-Wilson was covered by this policy.

**{3}**    Before filing suit on Plaintiff's behalf, Plaintiff's attorney, Thell Thomas, attempted to negotiate a settlement with Penske's claims representative, Jennifer McCormick.  In March 2009, Thomas sent McCormick a letter detailing his client's damages and outlining his legal theories.  The letter concluded by offering "to resolve all ongoing losses from this claim for $437,850[]."

**{4}**    McCormick responded in April 2009 with a letter to Thomas "tendering our limit of $25,000[] in bodily injury."  McCormick's letter asked Thomas to have his client sign a release enclosed with the letter.  The release stated that Plaintiff, in consideration of $25,000, "release[s] and forever discharge[s] Penske . . ., Old Republic Insurance Company & Gallagher Bassett Services, Inc., Distracted by Décor[,] and . . . Jones[-]Wilson" from all claims sustained as a result of the accident.  Three days later, Thomas sent McCormick a letter rejecting her offer and continuing to extend his initial offer to settle for $437,850.

**{5}**    Nearly three months later, on July 10, 2009, attorney Paul Yarbrough faxed Thomas a letter stating that he represented Penske and that he was "now handling this matter on their behalf."  Yarbrough explained in his letter that McCormick had "extended the full policy limits available to compensate your client based upon the liability insurance policy procured by . . . Jones-Wilson."  Yarbrough's letter responded to Thomas's legal theories and concluded:

> I have been authorized to again offer the $25,000 policy limits to settle any and all claims against Penske and . . . Jones-Wilson per the terms of the release [McCormick] previously sent to you.  This offer will remain open for

2

a period of [thirty] days from today's date, and then it will be withdrawn.

It is apparent from this letter that Yarbrough was representing the interests of both Penske and Jones-Wilson.

{6}     On July 23, 2009, Thomas sent Yarbrough a letter following up on a phone conversation between the two attorneys that apparently took place following Thomas's receipt of Yarbrough's July 10 letter.  The letter stated:

> As we discussed, you were going to determine the amount of insurance coverage available through Penske for our client[.]  You also indicated that you were going to determine whether the driver of the Penske vehicle, . . . Jones-Wilson, has his own property and casualty insurance.

{7}     According to the evidence in the record, the next event that occurred was a phone conversation between Thomas and Yarbrough on August 11, 2009, which was thirty-two days from the date of Yarbrough's letter, two days after the expiration date the Yarbrough letter placed on its settlement offer.  The only evidence in the record as to the substance of this conversation is found in affidavits later filed by Yarbrough and Thomas.

{8}     Yarbrough's affidavit disclosed the negotiations that had taken place between McCormick and Thomas prior to Yarbrough's involvement in the case.  Yarbrough attached to his affidavit McCormick's letter to Thomas and Thomas's response, both of which we have described above.  The affidavit also described and attached Yarbrough's July 10 letter to Thomas.  The affidavit then stated, "On August 11, 2009, Mr. Thomas verbally accepted the offer of [$]25,000 in full and final compromise settlement of [Plaintiff's] claims against Penske and . . . Jones-Wilson arising from the November 6, 2008[,] accident."  This is all that the affidavit said about the August 11 conversation.  The affidavit went on to state that Yarbrough requested a settlement check and mailed the release to Thomas on August 25, 2009.  The affidavit concluded, "To date, [Plaintiff] has failed to provide his signed release of claims to my office as agreed to by his counsel."

{9}     In contrast, Thomas's affidavit stated that he had a phone conversation with Yarbrough on August 11, 2009, "regarding a partial settlement of [Plaintiff's] claims."  The affidavit went on to state:

> It was my understanding that I agreed to settle all liability against Penske, for any claims of negligent entrustment against Penske, if any were revealed through the course of discovery.  And it was my understanding that the agreement released Penske as the primary insurer.  It was not my understanding that I was releasing . . . Jones-Wilson, and his personal auto policy.  It was a complete surprise to me when the release arrived and it released . . . Jones-Wilson, because I had never agreed to release . . . Jones-Wilson. . . .  For the reasons stated, it was never my understanding that these

3

settlement discussions were an acceptance of . . . Yarbrough's written offer extended in his July 10, 2009[,] letter. Additionally . . . Yarbrough's written offer had expired.

According to Plaintiff's pleadings, when Thomas received the proposed release from Yarbrough, he immediately called Yarbrough "and informed him that there was not, and never had been, an agreement to release . . . Jones-Wilson individually."

**{10}** In October 2009, Thomas filed suit on Plaintiff's behalf against Jones-Wilson, Distracted by Décor, and the City of Albuquerque, alleging that the negligence of each defendant contributed to cause Plaintiff's injuries in the November 2008 car accident. Jones-Wilson, now represented by attorneys other than Yarbrough, answered the complaint but did not raise any affirmative defenses claiming that Plaintiff's claims against him had been settled. Indeed, Jones-Wilson initiated discovery by serving Plaintiff with interrogatories and a request for production.

**{11}** Nearly four months after Plaintiff filed his complaint, Jones-Wilson filed a motion to enforce an alleged settlement agreement, claiming that Thomas had verbally accepted the settlement offer made in Yarbrough's July 10, 2009, letter. Attached to the motion were Yarbrough's affidavit and its attachments, as described above. Plaintiff responded, denying that a settlement agreement had been reached, and he attached to his response Thomas's affidavit.

**{12}** Between the filing of Jones-Wilson's motion and the filing of Plaintiff's response, Plaintiff filed a first amended complaint adding Robert Osborn as a defendant, doing business as Distracted by Décor. Jones-Wilson's answer to the first amended complaint asserted, for the first time, the affirmative defenses of accord and satisfaction and "a prior settlement agreement entered into between Plaintiff and Penske."

**{13}** The district court held a hearing on Jones-Wilson's motion. The parties did not present any evidence at the hearing (although defense counsel apparently provided the court with a copy of the McCormick release referenced in Yarbrough's July 10 letter), and they relied exclusively on the exhibits attached to their pleadings. At the conclusion of the hearing, the district court stated that the proposed release and Yarbrough's letter "actually spell[ed] out what [were] the terms on the table, and having accepted in my mind those terms, I believe there's an enforceable agreement as between [P]laintiff and Penske and [Jones-Wilson] in this matter."

**{14}** Plaintiff then filed a motion to reconsider and submitted additional exhibits, including the affidavit of Plaintiff. In the affidavit, Plaintiff attested that in August 2009, he "decided to accept what [he] understood to be an offer of settlement of $25,000 for [his] claims against Penske." He stated,"In authorizing . . . Thomas to settle my claims against Penske for $25,000, I did not intend to settle my claims against . . . Jones-Wilson." He concluded, "I never authorized . . . Thomas to settle my claims against . . . Jones-Wilson for

4

$25,000."

**{15}** The district court held a hearing and considered all of the documentary evidence that had been presented in connection with the initial motion to enforce the alleged settlement and with the motion for reconsideration. The court took the matter under advisement and ultimately denied Plaintiff's motion for reconsideration. Plaintiff appeals.

## DISCUSSION

**{16}** Plaintiff makes five arguments for reversal: (1) Jones-Wilson lacked standing to enforce the alleged settlement agreement because he was not a party to the agreement; (2) the alleged agreement was precluded by NMSA 1978, Section 66-5-210 (1983), which, in Plaintiff's view, prohibits anything other than a written settlement agreement between parties involved in a motor vehicle accident; (3) New Mexico courts should adopt a policy precluding enforcement of any oral settlement agreement not reduced to writing and signed by both parties; (4) the alleged agreement was unenforceable because Plaintiff had not authorized Thomas to settle his claims against Jones-Wilson; and (5) the district court erroneously found mutual assent without any objective evidence supporting that determination. Because we conclude that Plaintiff never authorized Thomas to settle the claims against Jones-Wilson, we need not address Plaintiff's other arguments.

## Standard of Review

**{17}** The district court made findings of fact in this case based solely on documentary evidence. "Where an issue to be determined rests upon the interpretation of documentary evidence, an appellate court is in as good a position as the trial court to determine the facts and draw its own conclusion." *Maestas v. Martinez*, 107 N.M. 91, 93, 752 P.2d 1107, 1109 (Ct. App. 1988). We therefore review the evidence to determine whether the district court's findings were correct.

## Attorney's Authority to Settle

**{18}** We begin with New Mexico law addressing the scope of an attorney's authority to settle a case on behalf of his or her client. Our Supreme Court discussed the issue in *Augustus v. John Williams & Assoc., Inc.*, where the parties' attorneys exchanged settlement offers and then reached an oral settlement agreement at a later meeting. 92 N.M. 437, 438, 589 P.2d 1028, 1029 (1979). After the attorneys prepared the settlement documents, the plaintiff's attorney notified the defendant's attorney that his client refused to sign. *Id.* At the hearing on the defendant's motion to enforce the alleged agreement, the plaintiff's attorney "testified that he had no authority to enter into a final settlement agreement." *Id.* at 439, 589 P.2d at 1030.

**{19}** The district court refused to enforce the alleged agreement, and the Supreme Court affirmed. *Id.* at 440-41, 589 P.2d at 1031-32. The Court stated that the party seeking

enforcement of a settlement agreement "has the burden of establishing assent by the opposing party." *Id.* at 439, 589 P.2d at 1030 (internal quotation marks and citation omitted). While a client may authorize his or her attorney to settle a claim, "such authority must be clear and unequivocal." *Id.* (internal quotation marks and citation omitted). "An unauthorized compromise, executed by an attorney, unless subsequently ratified by his client, is of no effect and may be repudiated or ignored and treated as a nullity by the client." *Id.* (internal quotation marks and citation omitted).

**{20}**     Our Supreme Court applied the same principles in *Bolles v. Smith*, 92 N.M. 524, 591 P.2d 278 (1979), where the issue was "whether the oral settlement agreement entered into by [the] petitioner's attorney on [the] petitioner's behalf can be enforced, notwithstanding the fact that it was rejected by [the] petitioner prior to its approval by the court." *Id.* at 525, 591 P.2d at 279. The Court reversed the district court's order enforcing the settlement agreement entered into by the petitioner's attorney on two grounds. *Id.* First, the Court held that the Release Act, NMSA 1978, Sections 41-1-1 to -2 (1971), applied to prohibit the settlement while the petitioner was under the care of a physician. *Bolles*, 92 N.M. at 525, 591 P.2d at 279. Second, and of more relevance to the present case, the Court held that there was no enforceable agreement to settle because the attorney did not have specific authority to settle. *Id.* at 526, 591 P.2d at 280. The Court stated that "[i]n order for an attorney to bind a client to a settlement agreement, he must have specific authority to do so, unless there is an emergency or some overriding reason for enforcing the settlement despite the attorney's lack of specific authority." *Id.*; *see* Restatement (Third) of The Law Governing Lawyers § 22(1) (2000) (stating that "the following and comparable decisions are reserved to the client except when the client has validly authorized the lawyer to make the particular decision: whether and on what terms to settle a claim"); Restatement § 22, cmt. c (stating that "[t]his Section forbids a lawyer to make a settlement without the client's authorization").

**{21}**     Following *Augustus* and *Bolles*, this Court decided *Gonzales v. Atnip*, 102 N.M. 194, 692 P.2d 1343 (Ct. App. 1984). In contrast to the circumstances in *Augustus* and *Bolles*, it was undisputed in *Gonzales* that the plaintiff had specifically authorized his attorney to enter into the settlement agreement. 102 N.M. at 200, 692 P.2d at 1349. This Court distinguished the facts before it from *Bolles* and held that "a settlement of a lawsuit by an attorney with specific authority to settle is binding on the client. Thus, the settlement in this case is binding on [the plaintiff]." *Gonzales*, 100 N.M. at 200, 692 P.2d at 1349.

**{22}**     The Court in *Gonzales* also applied a burden of persuasion that initially appears to be different from that imposed in *Augustus*. While *Augustus* stated that the party seeking enforcement of an oral settlement agreement "has the burden of establishing assent by the opposing party," 92 N.M. at 439, 589 P.2d at 1030 (internal quotation marks and citation omitted), the Court in *Gonzales* asserted that "[a] party seeking relief from . . . a settlement has the burden of persuasion." 102 N.M. at 195, 692 P.2d at 1344. These holdings can be harmonized. *Augustus* and *Bolles* teach that an attorney may not settle a client's claim without specific authorization from the client and that if there is an issue as to whether there was authorization, the party seeking enforcement of an alleged settlement agreement has the

6

burden of establishing authorization. *Gonzales* holds that in a case where it is undisputed that client authorization existed, the burden of persuasion is on the party seeking to escape from the enforceability of an authorized settlement agreement.

**{23}** The circumstances in the present case are most similar to those in *Augustus* and *Bolles*. Indeed, there is nothing in the record disputing Plaintiff's affidavit attesting that he had not authorized Thomas to settle his claims against Jones-Wilson. Thus, Thomas did not have specific authority to assent to any settlement offer made in connection with the claims against Jones-Wilson, and Plaintiff argues that, as a result, the alleged agreement between Thomas and Yarbrough "is of no effect and may be repudiated or ignored and treated as a nullity." *Augustus*, 92 N.M. at 439, 589 P.2d at 1030 (internal quotation marks and citation omitted). However, Jones-Wilson argues, and the district court held, that Thomas had apparent authority to settle Plaintiff's claims against Jones-Wilson.

**{24}** Before considering whether apparent authority existed in this case, we first address Jones-Wilson's argument urging us to disregard Plaintiff's affidavit and the contention that Thomas lacked specific authority to settle the claims against Jones-Wilson. While Jones-Wilson's argument is somewhat unclear, it appears that he is arguing that Plaintiff waived consideration of Thomas's lack of authority because he did not raise the issue until he filed his motion for reconsideration. Although Jones-Wilson is correct that Plaintiff's argument regarding the absence of authority to settle came late in the proceedings, the district court considered Plaintiff's argument and affidavit and ruled on the merits. "Although a reviewing court generally will not review a claim of error unless the appellant timely objected below, it will do so when the trial court addressed the untimely objection on the merits." *Garcia v. Jeantette*, 2004-NMCA-004, ¶ 13, 134 N.M. 776, 82 P.3d 947.

**Apparent Authority**

**{25}** The district court made the following finding on the issue of Thomas's authority to settle Plaintiff's claims against Jones-Wilson:

> In the [m]otion for [r]econsideration, Plaintiff includes an affidavit wherein he states that he did not give his lawyer authority to settle with Penske under terms that included a release of . . . Jones-Wilson. While this may be true, this fact was not communicated to Penske's lawyer. In fact, Plaintiff's lawyer conducted himself in a manner that suggested that he had full authority to settle with Penske. Where a lawyer presents himself as having apparent authority to settle a case, the opposing party's lawyer is entitled to rely upon his apparent authority.

In support of this finding, the court cited several cases from other jurisdictions and one New Mexico case, *Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 106 N.M. 705, 749 P.2d 90 (1988).

7

**{26}** In *Navajo Tribe*, the parties reached a settlement agreement on the date trial was scheduled. *Id.* at 706, 749 P.2d at 91. The agreement was read into the record with all parties, including a representative of the tribe, approving the terms of the settlement in open court. *Id.* About six months later, the tribe repudiated the settlement, and the defendants asked the district court to enter a stipulated settlement. *Id.* The district court enforced the settlement, and our Supreme Court affirmed. *Id.* at 707-08, 749 P.2d at 92-93. The Court stated that "[w]hile an attorney's authority to settle must be expressly conferred, it is presumed that an attorney of record who settles his client's claim in open court has authority to do so unless rebutted by affirmative evidence to the contrary." *Id.* at 707, 749 P.2d at 92. Because the tribe presented no testimony from either its attorney or its representative establishing that the attorney had no authority to settle, the Court concluded that enforcement of the settlement was proper. *Id.*

**{27}** In addition, the Court concluded that even if the attorney did not have express authority to settle, she had apparent authority. The Court stated that "[a]pparent authority is that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing under such circumstances as to estop the principal from denying its existence." *Id.* (internal quotation marks and citation omitted). In the attorney-client context, therefore, "a principal must hold out his attorney as possessing authority to act on his behalf beyond procedural matters." *Id.* In *Navajo Tribe*, the tribe's representative stated in open court that he understood the settlement and approved it. *Id.* at 708, 749 P.2d at 93. This acquiescence to the terms of the settlement clothed the attorney with the apparent authority to settle on the tribe's behalf. *Id.*

**{28}** Turning to the district court's order in the present case, we conclude that the court misapprehended the concept of apparent authority. The court found that Thomas "conducted himself in a manner that suggested that he had full authority to settle with Penske" contrary to the holding in *Navajo Tribe*, which established that it is the client's conduct—not the attorney's—that gives rise to apparent authority. In *Navajo Tribe*, in contrast to the circumstances in the present case, the tribe's representative heard the terms of the agreement as they were read into the court record and stated his approval of those terms.

**{29}** This view of apparent authority—that it is the client's conduct that is critical—is supported by the Restatement (Third) of The Law Governing Lawyers, which our appellate courts have accepted as a persuasive statement of the law. *See State v. Gonzales*, 2005-NMSC-025, ¶ 38, 138 N.M. 271, 119 P.3d 151 (adopting the Restatement's statement of an ethical rule applicable to prosecutors); *Bassett v. Sheehan*, 2008-NMCA-072, ¶ 9, 144 N.M. 178, 184 P.3d 1072 (relying on the Restatement for the proposition that a court may decide in the context of a motion for summary judgment whether a lawyer has breached the duty owed to a client, even though this is usually a question of fact). Section 27 of the Restatement states:

> A lawyer's act is considered to be that of the client in proceedings before a tribunal or in dealings with a third person if the tribunal or third

person reasonably assumes that the lawyer is authorized to do the act on the basis of the client's (and not the lawyer's) manifestations of such authorization.

The Restatement's comments elaborate on this principle, stating that "authority arising from the act of retention [of the lawyer] alone does not extend to matters, such as approving a settlement, reserved for client decision. . . . To create apparent authority in such matters, the client must do more than simply retain the lawyer[.]" *Id.* cmt. a. In addition,

> [w]hen a lawyer purports to enter a settlement binding on the client but lacks authority to do so, the burden of inconvenience resulting if the client repudiates the settlement is properly left with the opposing party, who should know that settlements are normally subject to approval by the client and who has no manifested contrary indication from the client.

*Id.* cmt. d.

**{30}** In the case before us, there was no evidence in the record of *any* conduct or communication by Plaintiff that was known to Jones-Wilson's attorney, much less any conduct or communication suggesting that Plaintiff had clothed Thomas with the apparent authority to settle with Jones-Wilson for $25,000. While there was considerable evidence regarding Thomas's conduct, his conduct is not determinative. Consequently, the district court's finding that Thomas had the apparent authority to settle with Jones-Wilson has no evidentiary support.

**{31}** The district court also erroneously placed the burden of persuasion on Plaintiff to establish that he did not create apparent authority in Thomas to settle with Jones-Wilson. The district court's finding suggested that the absence of authority had to be "communicated" to Jones-Wilson's attorney and that without such communication, Thomas's apparent authority would be presumed. As we have already discussed, when the existence of authority to settle is disputed, the burden falls on the party seeking enforcement of the alleged settlement agreement. *See Augustus*, 92 N.M. at 439, 589 P.2d at 1030.

**{32}** Placing the "burden of inconvenience," Restatement § 27, cmt. d, on Jones-Wilson under these circumstances is not unreasonable. Oral settlement negotiations provide fertile ground for miscommunication or misunderstanding, and it is not surprising that two parties to a phone call would have different perceptions of the agreed-upon terms. As a result, it makes sense that the law requires some affirmative indication from each client that his or her attorneys had the appropriate authority to settle before a settlement agreement is enforced.

**{33}** In conclusion, we hold that Plaintiff's unrefuted affidavit established that Thomas lacked the express authority to settle Plaintiff's claims against Jones-Wilson. In claiming that Thomas had the apparent authority to settle those claims, the burden of persuasion fell on Jones-Wilson to come forward with evidence that Plaintiff, rather than Thomas,

9

conducted himself in a way that created the appearance that Thomas had settlement authorization. Jones-Wilson failed to present such evidence, and the alleged settlement agreement is therefore unenforceable.

**CONCLUSION**

**{34}**   For the foregoing reasons, we reverse the district court's order enforcing the alleged settlement agreement and remand for proceedings consistent with this Opinion.

**{35}   IT IS SO ORDERED.**

             _____

             **CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**MICHAEL E. VIGIL, Judge**

**Topic Index for *Gomez v. Jones-Wilson*, No. 31,085**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Settlement Agreement

**INSURANCE**
Motor Vehicle Insurance
Settlement

**JUDGMENT**
Settlements